**KATZ BANKS KUMIN LLP**
Matthew LaGarde (Bar Number: 21835)
Carolyn L. Wheeler*
Rachel E. Green*
11 Dupont Circle, Suite 600
Washington, D.C. 20036
Tel: (202) 299-1140
Fax: (202) 299-1148
Email: lagarde@katzbanks.com
        wheeler@katzbanks.com
        green@katzbanks.com

Rebecca Peterson-Fisher*
Isabel Rothberg*
235 Montgomery Street, Suite 665
San Francisco, CA 94104
Tel: (415) 813-3260
Fax: (415) 813-2495
Email: peterson-fisher@katzbanks.com
        rothberg@katzbanks.com

*Counsel for Plaintiff*
*\*pro hac vice application forthcoming*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| SARAH O'NEILL,[1] | ) | Civil Action No: 25-_____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT FOR DAMAGES AND** |
| | ) | **INJUNCTIVE RELIEF** |
| | ) | |
| | ) | **PLAINTIFF DEMANDS A** |
| LIEUTENANT GENERAL | ) | **TRIAL BY JURY** |
| WILLIAM J. HARTMAN, USA, | ) | |
| Performing the Duties of the Director, | ) | |
| National Security Agency | ) | |
| 9800 Savage Road | ) | |
| Fort George G. Meade, MD 20755, | ) | |
| | ) | |
| Defendant. | ) | |

---

[1] Ms. O'Neill resides in Howard County, Maryland.  In a concurrently filed motion, Plaintiff requests a waiver of the requirement under Local Rule 102.2(a) to provide her home address in the case caption.

Plaintiff Sarah O'Neill ("Ms. O'Neill" or "Plaintiff"), by and through her attorneys, Katz Banks Kumin LLP, alleges, upon personal knowledge as to herself and information and belief as to other matters, as follows:

## INTRODUCTION

1.      Plaintiff Sarah O'Neill is a data scientist and a transgender woman.

2.      Since 2019, she has faithfully served the United States as an employee of the National Security Agency ("NSA" or the "Agency"), working each day in support of the NSA's mission, to provide foreign signals intelligence to U.S. policymakers and to our military, and to defend against cyber threats to national security systems.  She intended to spend the rest of her working life at the NSA until retirement.

3.      On January 20, 2025, President Donald J. Trump issued Executive Order 14168,[2] which declares that it is the policy of the United States government to deny Ms. O'Neill's very existence.

4.      Title VII of the Civil Rights Act of 1964 ("Title VII") protects Ms. O'Neill and employees throughout our nation from sex discrimination.  In *Bostock v. Clayton County*, 590 U.S. 644 (2020), the Supreme Court held that it is impossible to discriminate against an employee for being transgender without unlawfully discriminating based on sex in violation of Title VII.

---

[2] Exec. Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government/.

5.      Nearly forty years ago, the Supreme Court established in *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986), that subjecting an employee to a hostile work environment because of sex is a form of discrimination prohibited by Title VII.

6.      Since January 20, 2025, the NSA has undertaken a series of actions that have created a hostile work environment for Ms. O'Neill, including cancelling its policy recognizing her identity and right to a workplace free of unlawful harassment, prohibiting her from identifying her pronouns as female in written communications, purging references to transgender people from its materials, and barring her from using the women's restroom at work.

7.      These policies communicate a message, stated simply by Secretary of Defense Pete Hegseth (@PeteHegseth) in a post on X: "No More Trans @ DoD."

8.      The NSA's anti-transgender policies pervade Ms. O'Neill's workplace.  Ms. O'Neill must go to work each day in an environment in which the leadership of her agency denigrates her identity and denies her protections codified in federal law and confirmed by the Supreme Court.  To comply with the NSA's restrictive restroom policy, she must either use the men's restroom or single occupancy restrooms.  As using the men's restroom would cause her significant distress and could jeopardize her safety, Ms. O'Neill uses only single-occupancy restrooms at work.  However, these are not readily accessible in all the locations in which she is required to work.  As a result, to lessen her need to use a restroom, she has reduced her water intake during the workday and usually only eats lunch once every couple of weeks.

9.      As a result of the NSA's anti-transgender policies, Ms. O'Neill has experienced anxiety, fear, and distress, which has made it more difficult for her to perform her job duties at the high level she has maintained throughout her employment at the NSA until this year.  Ms. O'Neill has questioned whether she can continue to endure the intense and explicit hostility of

agency leadership toward her and other transgender employees that has emerged since President Trump took office in January, or if she will be forced to leave her job to preserve her mental and physical health, foregoing important professional opportunities and the accumulation of years of service which would result in a higher pension upon her retirement. The loss would not be only Ms. O'Neill's. Our country would also lose the benefit of a talented and committed data scientist whose contributions to national security are profoundly important.

10.    Ms. O'Neill now brings this lawsuit because those responsible for ensuring that the NSA complies with federal antidiscrimination laws have refused to stop President Trump's campaign to systematically attack transgender people in federal service. Instead, they have been complicit. It therefore falls on employees like Ms. O'Neill to seek relief in the federal courts.

11.    Ms. O'Neill brings a claim under Title VII for unlawful harassment based on sex and seeks an order enjoining the NSA from enforcement of policies that prohibit her from using restrooms that align with her gender identity, prohibit her from using pronouns aligned with her gender identity in written communications, and prevent her from accessing or viewing information about her civil rights under Title VII as a transgender person.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under federal law.

13.    Venue is proper in the District of Maryland pursuant to 28 U.S.C. §§ 1391(b)(1), (b)(2), and (e) because at least one Defendant resides in this district, a substantial part of the events or omissions giving rise to the claims occurred in this District, and Defendant is an officer of an agency of the United States sued in his official capacity.

## ADMINISTRATIVE EXHAUSTION

14.     Ms. O'Neill filed a formal complaint of discrimination on May 8, 2025, with the NSA's Office of Discrimination Complaints and the Equal Employment Opportunity and Accessibility office.  On September 25, 2025, the NSA issued its Final Agency Decision.

15.     Ms. O'Neill hereby files her civil action within 90 days of receipt of notice of final action taken by the NSA, which satisfies the requirement for exhaustion of administrative remedies under Title VII.  42 U.S.C. § 2000e-16(c).

## PARTIES

### A.  Plaintiff

16.     Plaintiff Sarah O'Neill is a transgender woman who has at all relevant times been an employee of the NSA at its headquarters in Fort Meade, Maryland.

### B.  Defendant

17.     Defendant William J. Hartman is the Acting Director of the NSA.  He is sued in his official capacity.

## FACTUAL ALLEGATIONS

18.     Plaintiff Sarah O'Neill is a data scientist employed by the NSA as a Technical Leader.  She is also a transgender woman.

19.     The NSA is a Department of Defense ("DoD") combat support and intelligence agency.  The NSA is the lead government agency focused on cryptology, which is the study of secret and secure communication encompassing both the creation and breaking of secure communication systems.  The NSA's mission encompasses both signals intelligence insights and cybersecurity defense.  The NSA's work is vital to national security.

20.     Ms. O'Neill, a curious person naturally drawn to science, studied physics in college and graduate school, obtaining a Bachelor of Science and a Master of Science in Physics. Prior to her employment at the NSA, Ms. O'Neill worked as a graduate student research assistant at the Goddard Space Flight Center, NASA's premier space flight complex.

21.     In 2018, Ms. O'Neill applied for a position at the NSA as a data scientist and was hired.  At the time she was hired in January 2019, Ms. O'Neill was living as a woman and had begun her physical gender transition.

22.     Sarah O'Neill is Ms. O'Neill's legal name, and her identity documents state her sex is female.

## A. Background on Gender Identity and Transgender People

23.     Gender identity is a person's fundamental, internal sense of themselves as belonging to a particular gender.  There is a medical consensus that gender identity cannot be consciously changed or "turned off" and that efforts to change a person's gender identity are unethical and harmful to a person's health and well-being.[3]

24.     A transgender person is someone who has a gender identity that differs from their sex assigned at birth.  A transgender woman has a female gender identity but was designated as male at birth.  A transgender man has a male gender identity but was designated as female at birth.

---

[3] Jessica N. Fish & Stephen T. Russell, *Sexual Orientation and Gender Identity Change Efforts are Unethical and Harmful*, 110 Am. J. Pub. Health 1113 (2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC7349462/pdf/AJPH.2020.305765.pdf; Caitlin Ryan et al., *Parent-Initiated Sexual Orientation Change Efforts with LGBT Adolescents: Implications for Young Adult Mental Health and Adjustment*, 67 J. Homosexuality 159 (2018), https://doi.org/10.1080/00918369.2018.1538407; J.P. Dehlin et al., *Sexual Orientation Change Efforts Among Current or Former LDS Church Members*, 62 J. Counseling Psych. 95 (2015), https://doi.org/10.1037/cou0000011.

25.     "Sex assigned at birth" refers to the designation of sex generally noted on a person's birth certificate shortly after birth.  It is almost always based on the appearance of an infant's external genitalia.

26.     There is medical consensus that transgender people face increased risks to their physical and mental health when required to use restrooms according to their sex assigned at birth; that transgender people experience improved mental health when they have access to restrooms that align with their gender identity; and that there is no evidence that allowing transgender people access to bathrooms aligning with their gender identity jeopardizes safety or privacy.[4]

27.     Studies consistently show that using correct pronouns for transgender individuals significantly benefits their mental health and that using incorrect pronouns negatively impacts their health.[5]

---

[4] Jody L. Herman et al., *Safety and Privacy in Public Restrooms and Other Gendered Facilities*, Williams Institute (Feb. 2025), https://williamsinstitute.law.ucla.edu/publications/safety-in-restrooms-and-facilites/; Francisco Perales et al., *Access to Inclusive Public-Toilet Options and the Wellbeing of Trans and Gender Diverse Employees: Novel Evidence from a Large Australian Workplace Survey*, Int'l J. Transgender Health (2025), https://doi.org/10.1080/15532739.2025.2469278; Lance S. Weinhardt et al., *Transgender and Gender Nonconforming Youths' Public Facilities Use and Psychological Well-Being: A Mixed-Method Study*, 2 Transgender Health 140 (2017), https://www.liebertpub.com/doi/10.1089/trgh.2017.0020.

[5] K.A. McLemore, *A Minority Stress Perspective on Transgender Individuals' Experiences with Misgendering*, 3 Stigma & Health 53 (2018), https://psycnet.apa.org/doiLanding?doi=10.1037%2Fsah0000070; Amanda M. Pollitt, *Predictors and Mental Health Benefits of Chosen Name Use among Transgender Youth*, 53 Youth & Soc. 320 (2019), https://journals.sagepub.com/doi/10.1177/0044118X19855898; The Trevor Project, *National Survey on LGBTQ Youth Mental Health 2020*, https://www.thetrevorproject.org/survey-2020/.

**B. Transgender Federal Employees' Rights**

28.    In 2012, in *Macy v. Dep't of Justice*, the Equal Employment Opportunity Commission ("EEOC") recognized that discrimination based on transgender status is sex discrimination in violation of Title VII.[6]

29.    In 2015, in *Lusardi v. Dep't of the Army*,[7] the EEOC ruled that denying an employee access to a common restroom consistent with the employee's gender identity is sex discrimination.

30.    In 2017, the Office of Personnel Management ("OPM"), the chief human resources agency and personnel policy manager of the federal government, issued *Guidance Regarding the Employment of Transgender Individuals in the Federal Workplace* ("2017 OPM Guidance"), which stated that it was the policy of the federal government "to treat all of its employees with dignity and respect and to provide a workplace that is free from discrimination," including based on gender identity.  This memorandum directed agencies to, among other things, "use the name and pronouns appropriate to the gender identity of the employee, as expressed by the employee," including on email accounts and in employee directories, and to allow transgender employees to access restrooms "consistent with the employee's gender identity."[8]

31.    From at least January 2022 until approximately April 8, 2025, the NSA had an internal policy, NSA Policy 1-78, "Gender Identity, Expression, and Affirmation" ("NSA Policy 1-78"), which, in accordance with *Lusardi* and the 2017 OPM Guidance, permitted NSA employees to use pronouns and restrooms consistent with their gender identity.

---

[6] EEOC Appeal No. 0120120821, 2012 WL 1435995 (Apr. 12, 2012).
[7] EEOC Appeal No. 0120133395, 2015 WL 1607756 (Mar. 27, 2015).
[8] U.S. Off. of Pers. Mgmt., Guidance Regarding Gender Identity and Inclusion in the Federal Workplace (Jan. 18, 2017), https://www.nrc.gov/docs/ML1702/ML17023A024.pdf.

32.     In 2020, the Supreme Court ruled in *Bostock v. Clayton County*, 590 U.S. 644 (2020), that Title VII's prohibition on sex discrimination includes discrimination based on gender identity and sexual orientation.

33.     In 2023, following the *Bostock* decision, OPM updated its 2017 Guidance to direct agencies to revise their policies, practices, and trainings to ensure a non-discriminatory and inclusive work environment for all employees "irrespective of their sex, gender identity, gender expression, or sexual orientation[.]"[9]

34.     From approximately March 2, 2023, until approximately January 30, 2025, the NSA had an internal policy, NSA Policy 6-33, "User Identification on the NSA/CSS Classified Network," ("NSA Policy 6-33"), which permitted NSA employees to use pronouns and primary names aligned with their gender identity on NSA information systems.

### C. President Trump's Executive Order 14168

35.     On January 20, 2025, immediately after being inaugurated for the second time as President of the United States, Donald J. Trump issued Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" ("Executive Order").[10]

36.     The Executive Order sets forth a biologically incoherent definition of sex, stating, in a rejection of medical consensus and science, that "sex" is based on "immutable" biological characteristics determined at conception.  §§ 2(a), 2(d), 2(e).

---

[9] U.S. Off. of Pers. Mgmt., Guidance Regarding Gender Identity and Inclusion in the Federal Workplace (Mar. 31, 2023), https://perma.cc/T2CU-39TL.

[10] Exec. Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615, (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government/.

37.    The Executive Order rejects the existence of gender identity altogether, let alone the possibility that someone's gender identity can differ from their sex, which it characterizes as "gender ideology."  § 2(a)-(f).

38.    The Executive Order bans all "statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology," i.e., all communications which mention the existence of transgender and nonbinary people or their workplace rights.  § 2(e).  It prohibits any use of federal funds to "promote gender ideology."  § 2(g).

39.    The Executive Order requires agencies to implement its fixed, binary definition of sex and further requires that intimate, sex-segregated spaces in federal workplaces, such as bathrooms, be designated by "biological sex," as defined by the Executive Order.  §§ 3(b), 3(c), 3(e), 4(d).  In particular, it provides that agencies must "tak[e] appropriate action to ensure that intimate spaces designed for women, girls, or females (or for men, boys, or males) are designated by sex and not identity."  § 4(d).

40.    The Executive Order is a direct assault on the rights and dignity of transgender and nonbinary people.  Federal courts have declared portions of the Executive Order unconstitutional.  *See, e.g.*, *Schlacter v. United States*, No. CV GLR-25-1344, 2025 WL 2606101, at *10 (D. Md. Sept. 9, 2025) (granting preliminary injunction barring enforcement of State Department's policy to only issue passports reflecting sex assigned at birth because the policy likely violated transgender citizens' equal protection rights); *San Francisco A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184, 1214 (N.D. Cal. 2025) (granting preliminary injunction on claim for purposeful discrimination based on transgender status as facially in violation of the equal protection clause); *Rhode Island Latino Arts v. Nat'l Endowment for the Arts*, 777 F. Supp.

3d 87, 109 (D.R.I. 2025) (finding plaintiffs likely to succeed on the merits on the claim that the

agency's implementation of the Executive Order constituted viewpoint discrimination in

violation of the First Amendment).

41.    Federal courts have also found that the Executive Order is based on animus

against transgender people.  *See, e.g.*, *Talbott v. United States*, No. 25-cv-00240 (ACR), 2025

WL 842332, at *326 (D.D.C. Mar. 18, 2025) (finding the executive order banning transgender

people from serving in the military "soaked in animus and dripping with pretext");

*Washington v. Trump*, No. 2:25-cv-00244-LK, 2025 WL 659057, at *1277 (W.D. Wash. Feb. 28,

2025) (concluding that the "Executive Order . . . reflects a bare desire to harm a politically

unpopular group as its underlying actual purpose" and noting that "[i]ts language . . . denies and

denigrates the very existence of transgender people—despite the evidence that they do exist and

have as long as human history has been recorded") (*In Re: Admin. Subpoena No. 25-143-019*,

No.1:25-MC-91324-MJJ, 2025 WL 2607784, at *1, *7 (D. Mass. Sept. 9, 2025) (noting the

Administration has made "its disapproval of the transgender community well known" and

quashing a DOJ subpoena intended to "harass and intimidate" a hospital from providing gender

affirming medical care).

**D.  Implementation of the Executive Order at the NSA**

42.    On January 29, 2025, then-Acting Director of OPM Charles Ezell issued a

Memorandum (the "OPM Memorandum") to the "Heads and Acting Heads of Departments and

Agencies" regarding the Executive Order.  The OPM Memorandum directed each agency head,

including the head of the Department of Defense, to terminate any agency programs that

"promote or inculcate gender ideology;" "[t]ake down all outward facing media. . . that inculcate

or promote gender ideology;" turn off email system features that prompt users for their pronouns;

cancel employee resource groups and trainings that "inculcate or promote gender ideology;" ensure that all forms, policies, and documents use "sex" and not "gender;" and "[e]nsure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by biological sex and not gender identity."[11]

43.    On approximately January 30, 2025, the NSA updated NSA Policy 6-33 to prohibit Agency personnel from using any pronouns in their signature blocks and removed all references in NSA Policy 6-33 to NSA Policy 1-78.  Prior to this policy change, Agency personnel were permitted to use pronouns in their signature blocks that aligned with their gender identity, including using "they" or "them" pronouns.

44.    On January 31, 2025, Secretary of Defense Pete Hegseth issued a memorandum (the "Hegseth Memorandum") for senior Pentagon leadership and Defense agency and DoD field activity directors.  The Hegseth Memorandum stated that "President Trump has given us our marching order in his Executive Order 14168," provided that "[e]ffective immediately, the Department of Defense will remove all traces of gender ideology," and directed all DoD components, including the NSA where Ms. O'Neill is employed, to "[e]nsure that intimate spaces designed for women, girls, or female (or for men, boys, or males) are designated by sex and not identity."[12]

45.    Also on January 31, 2025, Darin S. Selnick, performing the duties of the Under Secretary of Defense for Personnel and Readiness, issued a memorandum (the "Selnick

---

[11] Memorandum from Charles Ezell, Acting Dir., U.S. Off. Pers. Mgmt., to Heads & Acting Heads of Dep'ts & Agencies (Jan. 29, 2025), https://www.opm.gov/media/yvlh1r3i/opm-memo-initial-guidance-regarding-trump-executive-order-defending-women-1-29-2025-final.pdf.
[12] Memorandum from Peter Hegseth, Sec'y of Def., for Senior Pentagon Leadership (Jan. 31, 2025), https://www.af.mil/Portals/1/documents/2025SAF/2025013_-_SD_Memo_-_Defending_Women_(002).pdf [Archived at https://web.archive.org/web/20250522163432/https://www.af.mil/Portals/1/documents/2025SAF/2025013_-_SD_Memo_-_Defending_Women_(002).pdf].

Memorandum") for all DoD civilian employees regarding "Department of Defense Implementation of Executive Order 14168, 'Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government.'" The Selnick Memorandum referenced the Executive Order and stated that the "Department of Defense will take prompt action to ensure that all programs and activities align with [the] principles" of the Executive Order."[13]

46. On March 4, 2025, Tim Dill, performing the duties of the Assistant Secretary for Defense for Manpower and Reserve Affairs, issued a Memorandum (the "DoD Memorandum") to Senior Pentagon leadership, commanders of the combatant commands, and defense agency and DoD field activity directors.[14] The DoD Memorandum stated that transgender individuals are no longer permitted to serve in the military and that "[p]ronoun usage when referring to Service members must reflect a Service member's sex."

47. In March 2025, the NSA amended NSA Policy 6-33 by providing that Agency personnel were permitted to use pronouns in their email signature blocks, but only if they were in accordance with the Executive Order.

48. On multiple occasions between approximately March 2025 and the present, the NSA's Equal Employment Opportunity Policy was updated to restrict the availability of

---

[13] Memorandum from Darin S. Selnick, Acting Under Sec'y of Def., for All Dep't of Def. Civilian Emps (Jan. 31, 2025), https://www.dcpas.osd.mil/sites/default/files/2025-02/department_of_defense_implementation_of_eo_14168-_defending_women_from_gender_ideology_extremism_and_restoring_biological_truth_to_the_federal_government.pdf.
[14] Memorandum from Tim Dill, Acting Under Sec'y of Def., for Senior Pentagon Leadership, Commanders of the Combatant Commands, Def. Agency and DOD Field Activity Dirs. (Mar. 4, 2025), https://www.war.gov/Portals/1/Spotlight/2025/Guidance_For_Federal_Policies/M&RA-Guidance-Prioritizing-Military-Excellence-and-Readiness-Retention-and-Accession-Waivers.pdf.

information about anti-discrimination laws applicable to LGBTQ+ people and the words

"transgender" and "nonbinary." [15]

49.     On March 19, 2025, the NSA issued a newsletter to the entire Agency, including

both military service members and civilian employees, explaining the updates to NSA Policy 6-

33 ("March 19 Newsletter"), stating that use of pronouns in signature blocks is permitted, but

must comply with the Executive Order and follow-on guidance from the DoD that "pronoun

usage when referring to Service members must reflect a Service member's sex."

50.     The newsletter further provided clarification from the NSA Inspector General that

although "EO 14168 doesn't directly mention pronouns or their removal," because the Executive

Order specifies that "sex" should only refer to a person's "immutable biological classification as

male or female" and because the Executive Order defines "gender ideology terminology" as a

replacement for "the biological category of sex with an ever-shifting concept of self-assessed

gender identity," "gender ideology terminology . . . is not permitted."  The newsletter specified:

"This would include, for example, the use of the term 'they' instead of 'she' or 'he.'"  The

newsletter further stated, "if any employee, including military personnel, chooses to include

pronouns within the content of official correspondence, it must also be consistent with this

guidance."

51.     Based on this communication in the March 19 Newsletter, Ms. O'Neill

understands the Agency's current policy applicable to military, contractor, and civilian

employees alike to be that Agency employees are prohibited from identifying pronouns in

written communications that are inconsistent with the Executive Order's definition of "sex,"

---

[15] "LGBTQ+" refers to individuals who are lesbian, gay, bisexual, transgender, queer, intersex and/or nonbinary.

such that she could face discipline if she were to identify her pronouns as feminine in an email or other written communication for work.

52.    Between approximately March 20, 2025 and May 5, 2025, Ms. O'Neill became aware that the Equal Employment Opportunity ("EEO") signage had been removed from NSA common areas.  Prior to its removal, the NSA EEO signage stated that employees were protected from discrimination on the basis of certain characteristics, including age, race, and sex.  Where the EEO signage stated employees were protected from discrimination on the basis of sex, the signage included a parenthetical stating that transgender status and gender identity were included.  Since the EEO signage has been removed, Ms. O'Neill is aware of only one sign about equal employment rights in the workplace, which states that employees are protected from discrimination on the basis of sex but does not include the parenthetical about the inclusion of transgender status and gender identity.

53.    On April 8, 2025, the NSA canceled NSA Policy 1-78.  In a newsletter announcing this cancellation ("April 8 Newsletter"), the NSA advised the workforce that, "effective immediately," all NSA personnel are required to use Agency intimate spaces, including restrooms, "in accordance with their biological sex, not gender identity."

54.    On May 6, 2025, Secretary of Defense Pete Hegseth (@PeteHegseth) published a post on X that stated: "No More Trans @ DoD" ("Hegseth X Post").

55.    On approximately May 9, 2025, the NSA issued a newsletter stating that the Agency had modified its purchase order guidance to comply with the Executive Order prohibiting federal funding for language that "inculcates gender ideology," which impacted the Agency's ability to purchase materials containing references to gender identity, including the words "transgender" or "nonbinary."

56.     Prior to the Executive Order and the Department of Defense's, OPM's, and NSA's actions taken to implement it, NSA personnel had the option to update their display name wherein they could select display name to use at work instead of their legal name ("Primary Name Change Tool"). This option was made available pursuant to NSA Policy 1-78 and NSA Policy 6-33 and enabled transgender people who had not completed the often-onerous process of legal name and gender change to display the name their coworkers should use to refer to them, eliminating the need to constantly disclose their transgender identity to others.

57.     On approximately May 14, 2025, Ms. O'Neill noticed that the Primary Name Change Tool was disabled and that the Primary Name Change briefing agreement, which provided instructions to NSA personnel about how to utilize the Tool, had been removed from the internal NSA website.

58.     The agency-specific implementing actions, including the Hegseth Memorandum, the Selnick Memorandum, NSA Policy 6-33, NSA's EEO Policy, NSA's cancellation of NSA Policy 1-78, the March 19 and April 8 NSA Newsletters and related policy changes, the Hegseth X Post, the revocation of the Primary Name Change Tool, as well as similar actions taken by the NSA and DoD to implement the Executive Order, are referred to collectively in this Complaint as the "DoD/NSA Implementation Actions."

**E. The Impact of the DoD/NSA Implementation Actions on Ms. O'Neill**

59.     Prior to the DoD/NSA Implementation Actions, Ms. O'Neill could rely on NSA Policy 1-78 for assurance that the NSA recognized and respected her identity and right to a workplace free of harassment and discrimination. The cancellation of NSA Policy 1-78 communicated to Ms. O'Neill that the NSA now does *not* recognize or respect her identity, nor will it protect her from harassment and discrimination. Because NSA Policy 1-78 has been

canceled, Ms. O'Neill now has no recourse within her agency if she experiences harassment or discrimination on the basis of sex. The cancellation of NSA Policy 1-78 has not only made Ms. O'Neill feel more vulnerable; it has actually made her more vulnerable.

60.     Prior to the DoD/NSA Implementation Actions, Ms. O'Neill could read her work newsletter each day without fear that it would contain an attack on who she is and her right to work at the Agency. As part of the DoD/NSA Implementation Actions, the NSA has subjected Ms. O'Neill repeatedly to hostile language in its newsletter that invalidates her identity and existence.

61.     Prior to the DoD/NSA Implementation Actions, Ms. O'Neill used "she" and "her" pronouns in her email signature block without issue. Ms. O'Neill found including her pronouns in her signature block to be helpful to avoid misgendering mistakes. No one at the NSA ever expressed to Ms. O'Neill any concern about her use of "she" and "her" pronouns in her signature block.

62.     Following the DoD/NSA Implementation Actions, Ms. O'Neill has stopped using any pronouns in her email signature block because she fears being disciplined for using feminine pronouns under the revised NSA Policy 6-33. Since Ms. O'Neill has stopped using pronouns in her signature block to comply with NSA Policy 6-33, she worries that there is now a higher chance of being misgendered. She is further worried that colleagues, in particular NSA leadership, are likely to intentionally misgender her because of DoD guidance in the DoD Memorandum that "pronoun usage when referring to Service members must reflect a Service member's sex" and the March 19 Newsletter applying that guidance to NSA employees.

63.     Upon information and belief and based on the 2017 OPM Guidance and the now-cancelled NSA Policy 1-78, NSA leadership is aware that misgendering is harmful to

transgender employees.  Yet NSA leadership has intentionally taken steps to implement a policy which prohibits Ms. O'Neill from using the correct pronouns to refer to herself in written communications at work.  This policy intentionally delegitimizes Ms. O'Neill's gender identity and undermines her sense of belonging in the workplace.

64.    Prior to the DoD/NSA Implementation Actions, Ms. O'Neill used the women's restrooms at Fort Meade for several years.  No concerns about her use of the women's restroom were ever raised to her by her employer or coworkers.  Before the DoD/NSA Implementation Actions, the need to use the restroom at work was not a constant source of anxiety for Ms. O'Neill.

65.    Following the DoD/NSA Implementation Actions, Ms. O'Neill is required to use men's restrooms even though they do not align with her gender identity.  Upon information and belief, the NSA is actively enforcing its policy prohibiting transgender employees from using common restrooms consistent with their gender identities.  Ms. O'Neill is afraid she will face discipline if she uses the women's restroom.

66.    Using a men's restroom would be degrading, distressing, and humiliating for Ms. O'Neill not only because it is inconsistent with her gender identity, but because the policy requiring her to use the men's restroom is intended to cause her harm.  Upon information and belief, and based on the 2017 OPM Guidance and the now-cancelled NSA Policy 1-78, NSA leadership is aware that providing access to a restroom consistent with one's gender identity is essential to ensuring a nondiscriminatory workplace for transgender people.  Upon information and belief, NSA leadership is aware that requiring transgender people to use restrooms inconsistent with their gender identity causes psychological harm, immediately discloses to everyone in the vicinity that they are transgender, and thus increases the risk of harassment based

on gender identity. The NSA has implemented its discriminatory policy with the goal of

psychologically harming Ms. O'Neill and other transgender employees and making it more

difficult for them to work at the Agency.

67.     When possible, Ms. O'Neill tries to work around this discriminatory policy by

using single-occupancy restrooms. This is not an easy task: there are a limited number of single-

occupancy restrooms in the building where Ms. O'Neill performs most of her work. These

limited single-occupancy restrooms are often in use when Ms. O'Neill needs to use one. Nearby

buildings, if they have any single-occupancy restrooms at all, are several minutes' walk away.

This inaccessibility has made it impossible or impractical for Ms. O'Neill to use the restroom

during meetings or between meetings in the building where she performs most of her work.

68.     Ms. O'Neill's job duties also take her to several other buildings. To the extent

these other buildings have any single-occupancy restrooms, they are extremely limited and are

often in use when Ms. O'Neill needs to use a restroom.

69.     Sometimes it takes Ms. O'Neill up to fifteen minutes to find an available single-

occupancy restroom.

70.     When she does have to use the restroom, Ms. O'Neill is anxious about finding a

single-occupancy restroom in time. Ms. O'Neill cannot rely on always being close to a single-

occupancy restroom. It is not feasible for Ms. O'Neill to leave meetings to go to another

building, or to travel across the entire building she is in, to use the limited number of single-

occupancy restrooms available to her. She does not feel she can ask colleagues to pause a

meeting for fifteen minutes so she can use the restroom because it would be humiliating and

disrupt the flow of work. Nor can she miss fifteen minutes' worth of content from a meeting that

goes on while she searches for an available single-occupancy restroom.

71.    Instead, Ms. O'Neill must take steps to minimize the need to use the restroom at work.  As a result of the DoD/NSA Implementation Actions, everyday Ms. O'Neill goes to work, she is required to make decisions about whether she can eat or consume liquids.  Planning for how she will use the restroom is a constant concern.  To limit her need to use the restroom, Ms. O'Neill has reduced her water intake during the workday and usually only eats lunch once every couple of weeks.

72.    It is profoundly painful for Ms. O'Neill that the leadership of her agency is intentionally implementing a policy which is on a daily basis degrading, humiliating, and anxiety-provoking, impedes her professional performance, and as a practical matter requires her to restrict her food and water intake, all because of hostility to her gender identity.

73.    Prior to the DoD/NSA Implementation Actions, Ms. O'Neill felt she was a valued employee of the NSA, and that the NSA recognized that her skill and expertise were an important contribution to the NSA's mission.  Now, because of the DoD/NSA Implementation Actions, Ms. O'Neill has been made to feel devalued and unwanted.

74.    The DoD/NSA Implementation Actions, as workplace policies that affect Ms. O'Neill's daily employment, pervade her work environment with the message that transgender people are second-class citizens who are deserving of scorn.  These policies are intended to alter the conditions of employment for transgender employees to make them intolerable and to push transgender employees out of federal service.

75.    As a direct result of the DoD/NSA Implementation Actions, Ms. O'Neill has experienced anguish, stress headaches, emotional distress, and mental fatigue.  Being forced to avoid the women's restroom and to use only single-occupancy restrooms; feeling fearful of the possibility of being required to use the men's restroom; being prohibited from identifying her

correct pronouns in written communications at work; and witnessing the removal and erasure of information about civil rights and workplace protections for transgender employees have made Ms. O'Neill feel fundamentally unsafe existing as herself at work.

76.     After each DoD/NSA Implementation Action, Ms. O'Neill felt a profound sense of loss and struggled to absorb the information while sitting at work.  On each of these occasions, she experienced significant psychological distress yet had to maintain her composure to keep performing her job efficiently and effectively.

77.     At times, the cumulative impact of the DoD/NSA Implementation Actions has been too overwhelming for Ms. O'Neill to perform her work duties.  Ms. O'Neill often dreads going to work and finds it difficult to get out of bed in the morning, as it is constantly demoralizing to go to work feeling like a second-class citizen.  This emotional turmoil has impacted her health to the degree that she has been unable to go to work at all on more than a dozen occasions and has had to call out.  When Ms. O'Neill ran out of sick time and other paid time off, she had to take leave without pay.

78.     The actions of Defendant have caused Ms. O'Neill physical and emotional distress and have limited her ability to effectively perform her job and serve the NSA.

### FIRST CAUSE OF ACTION
**Discrimination in Violation of Title VII of the Civil Rights Act of 1964,
42 U.S.C. § 2000e *et seq.***

79.     Plaintiff hereby incorporates as though restated all of the factual allegations.

80.     Title VII states that "[a]ll personnel actions affecting [federal] employees . . . shall be made free from any discrimination based on . . . sex."  42 U.S.C. § 2000e-16(a).

81.     Discrimination based on transgender status is discrimination "based on sex" under Title VII.  *Bostock v. Clayton County*, 590 U.S. 644, 660 (2020).

82.     Pursuant to *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66–67 (1986), subjecting an employee to a hostile work environment because of sex is a form of discrimination prohibited by Title VII.

83.     The DoD/NSA Implementation Actions described herein are motivated by animus toward transgender people, and thus discriminatory on the basis of sex, and are sufficiently severe and pervasive to alter the conditions of Plaintiff's employment and render her work environment hostile in violation of Title VII.

84.     A reasonable person in Plaintiff's circumstances would consider the working environment to be hostile, and Plaintiff has subjectively experienced the working environment as hostile.

85.     The hostile work environment has unreasonably interfered with Plaintiff's work performance.

86.     As a direct and proximate result of the unlawful discrimination to which Defendant has subjected her, Plaintiff has suffered damages in the form of lost wages and emotional distress in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays this Court enters judgment in her favor and against Defendant for the following relief:

1.     Enter declaratory relief, including but not limited to a declaration that the actions of the Defendant violate Title VII;

2.     Enjoin Defendant, including its officers, employees, contractors, and agents, from implementing or enforcing the Executive Order, the OPM Memorandum, the Hegseth Memorandum, the Selnick Memorandum, the DoD Memorandum, NSA Policy 6-33, and any

other policy or practice that prevents Ms. O'Neill from using restrooms that align with her gender identity, prohibits her from using pronouns aligned with her gender identity in written communications at work, or prevents her from accessing or viewing information about her civil rights under Title VII as a transgender person; and

3.    Award Ms. O'Neill compensatory damages, and her costs and reasonable attorneys' fees pursuant to 28 U.S.C. § 2412, and any other applicable source of law;

4.    Award Ms. O'Neill pre-judgment and post-judgment interest, as provided by law; and

5.    Grant any other and further relief this Court deems just, proper, and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.


Dated: December 22, 2025

Respectfully submitted,

Matthew LaGarde (D. Md. Bar No. 21835)
Carolyn L. Wheeler*
Rachel E. Green*
**Katz Banks Kumin LLP**
11 Dupont Circle, Suite 600
Washington, D.C. 20036
Tel: (202) 299-1140
Fax: (202) 299-1148
Email:  lagarde@katzbanks.com
          wheeler@katzbanks.com
          green@katzbanks.com

Rebecca Peterson-Fisher*
Isabel Rothberg*
235 Montgomery Street, Suite 665
San Francisco, CA 94104

Tel: (415) 813-3260
Fax: (415) 813-2495
Email: peterson-fisher@katzbanks.com
            rothberg@katzbanks.com

*pro hac vice application forthcoming*

*Counsel for Plaintiff Sarah O'Neill*