**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| SARAH O'NEILL<br><br>Plaintiff,<br><br>v.<br><br>GENERAL JOSHUA M. RUDD,<br>Director, National Security Agency<br><br>Defendant. | ) | No. 1:25-cv-04228-LKG |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

## TABLE OF CONTENTS


INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 4

LEGAL STANDARD ........ 8

ARGUMENT ........ 10

A. Ms. O'Neill States A Plausible Title VII Claim. ........ 10

1. The DoD/NSA Implementation Actions Are Based on Sex ........ 11

a. The NSA's Policies Restricting Restroom and Pronoun Use Penalize Ms. O'Neill for Conduct Tolerated in Cisgender Women ........ 12

b. The DoD/NSA Implementation Actions Are Motivated By Hostility Toward Transgender People. ........ 13

2. The Supreme Court's Decision in *United States v. Skrmetti* Does Not Change the Analysis ........ 15

3. The DoD/NSA Implementation Actions Are Sufficiently Severe or Pervasive to Create a Hostile Work Environment. ........ 16

a. Under a Totality of the Circumstances Analysis, Non-Targeted Conduct Can Create a Hostile Work Environment. ........ 17

b. The DoD/NSA Implementation Actions Are Sufficiently Pervasive to Create a Hostile Work Environment. ........ 19

c. The DoD/NSA Implementation Actions Are Sufficiently Severe to Create a Hostile Work Environment. ........ 20

d. Ms. O'Neill Reasonably Perceived the Agency to be a Hostile Work Environment ........ 21

B. In the Alternative, Ms. O'Neill Should Be Granted Leave to Amend ........ 24

CONCLUSION ........ 25

## TABLE OF AUTHORITIES

### CASES

*Bostock v. Clayton County*,
590 U.S. 644 (2020) .......... 2, 11, 12, 14, 18
*Boyer-Liberto v. Fontainebleau Corp.*,
786 F.3d 264 (4th Cir. 2015) .......... 1, 23, 24
*Chamber of Comm. of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) .......... 12
*Chandler v. Roudebush*,
425 U.S. 840 (1976) .......... 10
*Clarke v. DynCorp Int'l LLC*,
962 F. Supp. 2d 781 (D. Md. 2013) .......... 10
*Copeland v. Georgia Dep't of Corr.*,
97 F.4th 766 (11th Cir. 2024) .......... 11
*Doe v. City of Detroit, Michigan*,
3 F.4th 294 (6th Cir. 2021) .......... 2, 11, 14
*Eller v. Prince George's Cnty. Pub. Schs.*,
580 F. Supp. 3d 154 (D. Md. 2022) .......... 11
*Ellison v. Brady*,
924 F.2d 872 (9th Cir. 1991) .......... 1
*Ford v. Jackson Nat'l Life Ins. Co.*,
45 F.4th 1202 (10th Cir. 2022). .......... 26
*Founding Church of Scientology of Washington, D.C., Inc. v. Nat'l Sec. Agency*,
610 F.2d 824 (D.C. Cir. 1979) .......... 15
*Goldfarb v. Mayor & City Council of Baltimore*,
791 F.3d 500 (4th Cir. 2015) .......... 9
*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) .......... 25
*Hamel v. Board of Education of Harford County*,
No. cv JKB-16-2876, 2018 WL 1453335 (D. Md. Mar. 23, 2018) .......... 22, 23
*Harris v. Forklift Sys., Inc.*,
510 U.S. 17 (1993) .......... 11, 19
*Lacayo v. Donahoe*,
No. 14-CV-04077-JSC, 2015 WL 993448 (N.D. Cal. Mar. 4, 2015) .......... 10
*Lange v. Houston County*,
152 F.4th 12450 (11th Cir. 2025) .......... 17
*Laurent-Workman v. Wormuth*,
54 F.4th 201 (4th Cir. 2022) .......... 9

*Lopez v. Mountain View Care & Rehab. Ctr., LLC*,
No. 3:19-cv-00785, 2022 WL 202955 (M.D. Pa. Jan. 21, 2022)........................................ 21, 22
*Loving v. Virginia*,
388 U.S. 1 (1967)........................................................................................................ 18
*Maldonado v. City of Altus*,
433 F.3d 1294 (10th Cir. 2006)................................................................................ 21, 22
*McNeal v. City of Blue Ash, Ohio*,
117 F.4th 887 (6th Cir. 2024)........................................................................................ 4
*Meritor Sav. Bank, FSB v. Vinson*,
477 U.S. 57 (1986)..........................................................................................10, 11, 19
*Nanni v. Aberdeen Marketplace, Inc.*,
878 F.3d 447 (4th Cir. 2017)...................................................................................... 9, 12
*Ocheltree v. Scollon Prods., Inc.*,
335 F.3d 325 (4th Cir. 2003)..................................................................11, 18, 20, 21, 24
*Oncale v. Sundowner Offshore Services, Inc.*,
523 U.S. 75 (1998)........................................................................................ 13, 14, 15, 24
*Rasmy v. Marriott Int'l, Inc.*,
952 F.3d 379 (2d Cir. 2020)........................................................................................ 20
*Sharp v. S&S Activewear, L.L.C.*,
69 F.4th 974 (9th Cir. 2023)................................................................................ 19, 20, 22
*Sharpe-Miller v. Walmart, Inc.*,
181 F. 4th 1037 (10th Cir. 2026)..............................................................................3, 11, 18
*Soucie v. David*,
448 F.2d 1067(D.C. Cir. 1971)...................................................................................... 12
*Spriggs v. Diamond Auto Glass*,
242 F.3d 179 (4th Cir. 2001)........................................................................................ 19
*United States v. Skrmetti,*
605 U.S. 495 (2025)...................................................................................... 3, 17, 18
*Vance v. Ball State Univ.,*
570 U.S. 421 (2013)...................................................................................................... 19
*Washington v. Trump,*
768 F. Supp. 3d 1239 (W.D. Wash. 2025)..................................................................... 16
*Withrow v. United States*,
No. 25-4073 (D.D.C. filed Nov. 21, 2025)........................................................................ 3

**STATUTES**

42 U.S.C. § 2000e-16(a)..................................................................................................... 9

**RULES**

Fed. R. Civ. P. 15(a)(2) .......... 23
Fed. R. Evid. 201(b)(2) .......... 9

**OTHER AUTHORITY**

Executive Order 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 30, 2025) (signed Jan. 20, 2025)..........4

## INTRODUCTION

Plaintiff Sarah O'Neill, a transgender woman who has faithfully served the United States as a data scientist at the National Security Agency (the "NSA" or the "Agency") since January 2019, alleges the NSA subjected her to a hostile work environment by taking a series of actions to ratify and implement President Trump's Executive Order 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (the "Executive Order" or "EO"), which intentionally mischaracterizes Ms. O'Neill and other transgender women as male and forbids federal agencies from acknowledging their existence or rights under Title VII. These actions, referred to collectively as the "DoD/NSA Implementation Actions," include requiring Ms. O'Neill to either use male pronouns in written communications or no pronouns at all; prohibiting her from using the women's restroom on the grounds that she is, they contend, male; prohibiting NSA materials from acknowledging the existence and/or rights of transgender people; barring agency personnel from contracting with vendors who acknowledge the existence and/or rights of transgender people; and removing signage which stated that Equal Employment Opportunity policies prohibiting harassment and discrimination on the basis of sex applied to transgender employees. *See* ECF No. 1 ("Compl.") ¶¶ 42–58. Ms. O'Neill plausibly alleges the DoD/NSA Implementation Actions were motivated by animus toward transgender people and intended to drive transgender people out of the federal workforce, and they have created an objectively and subjectively hostile work environment for her at the NSA because of her sex. *Id.* ¶¶ 59–78.[1]

---

[1] Ms. O'Neill need not prove the DoD/NSA Implementation Actions are motivated by animus to prevail on her hostile work environment claim. *See Boyer-Liberto v. Fontainebleau Corp.,* 786 F.3d 264, 282 (4th Cir. 2015) (en banc) ("[I]ntent to create a hostile work environment is not an element of a hostile environment claim."). Conduct may be unlawful harassment "even when harassers do not realize that their conduct creates a hostile working environment." *Ellison v. Brady*, 924 F.2d 872, 880 (9th Cir. 1991). However, Ms. O'Neill alleges sufficient facts to infer that animus toward transgender people is in fact the motive behind the DoD/NSA Implementation Actions

As the Supreme Court held in *Bostock v. Clayton County*, 590 U.S. 644, 662 (2020), "[f]or an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex." Likewise, to harass an employee because they are transgender is to harass them in part because of sex. *See*, *e.g.*, *Doe v. City of Detroit, Michigan*, 3 F.4th 294, 300 n.1 (6th Cir. 2021).

The DoD/NSA Implementation Actions adversely affect transgender people because of their transgender status, and therefore they are actions taken because of sex. They prohibit transgender employees like Ms. O'Neill from conduct her cisgender counterparts may freely engage in, thereby subjecting her to risk of discipline or job loss for using restrooms and pronouns consistent with her gender. In so doing, and in prohibiting any acknowledgment of the existence or rights of transgender people, they convey the message that transgender people are unworthy of equal respect and treatment—even more, the DoD/NSA Implementation Actions communicate that a transgender person's very identity is fraudulent and all mentions of transgender people's existence should be erased. The marginalization of transgender NSA employees is not an unintended by-product of the DoD/NSA Implementation Actions; it is their stated purpose. *See* Compl. ¶¶ 54, 74. This intentionally hostile conduct toward transgender people because they are transgender is, under *Bostock*, conduct based on sex. *See Doe,* 3 F.4th at 300 n.1.

Contrary to Defendant's contention, *United States v. Skrmetti,* 605 U.S. 495 (2025), has no bearing on this case. In *Skrmetti*, a facial equal protection challenge to a Tennessee law prohibiting doctors from prescribing puberty blockers or hormones to minors for the treatment of

---

adopting the reasoning and principles of the Executive Order, which supports her claim that the Implementation Actions are because of sex.

gender dysphoria, the Court applied the *Bostock* test and concluded that changing the sex of the minor did not change the application of the Tennessee law because a transgender person could obtain or be prohibited from obtaining the same treatment depending on their diagnosis. 605 U.S. at 519–22. Thus, the Court held the classification was based on medical use. *Id.* In contrast, there are no transgender employees who are permitted to use restrooms and pronouns consistent with their gender under the policies established by the DoD/NSA Implementation Actions.

Further, Ms. O'Neill's claim is not predicated on an allegation that the DoD/NSA Implementation Actions facially discriminate based on sex.[2] Ms. O'Neill brings a hostile work environment claim, and she need not prove that any single policy changes the terms and conditions of her employment because of sex to prevail. Rather, she alleges that under the totality of the circumstances standard, the cumulative effect of all of the DoD/NSA Implementation Actions renders her workplace hostile because she is transgender. *See Sharpe-Miller v. Walmart, Inc.*, 181 F.4th 1037 (10th Cir. 2026) ("[E]ach discriminatory act in a hostile work environment—irrespective of whether it amounts to a discrete, independently actionable discriminatory act—can constitute a substantive part of a hostile work environment claim."); *McNeal v. City of Blue Ash, Ohio*, 117 F.4th 887, 902 n.14 (6th Cir. 2024) ("[W]hen a discrete act . . . contributes to a different and continuing harm—for example, the pervasive humiliation of an employee, its ancillary impacts may be considered in a hostile-work-environment claim" regardless of whether it is actionable on its own).

[2] Although Ms. O'Neill's claim does not rely on a finding that the policies are facially discriminatory, that is not to say they are not—however, that question is before at least one other court for resolution. *See Withrow v. United States*, No. 25-4073 (D.D.C. filed Nov. 21, 2025).

Ms. O'Neill has plausibly alleged the DoD/NSA Implementation Actions constitute severe or pervasive harassment that rises to the level of an actionable hostile work environment. Policies that govern activities she must engage in on a daily basis at work are necessarily pervasive. Further, the Dod/NSA Implementation Actions explicitly adopt the reasoning and "principles" of Executive Order 14168, *see* Compl. ¶ 45—that Ms. O'Neill and transgender women like her make a "false claim that males can identify as and thus become women," and that Ms. O'Neill's existence has "a corrosive impact not just on women but on the validity of the entire American system," *see* Plaintiff's Request for Judicial Notice ("Pl.'s RJN"), Exhibit A, Executive Order 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 30, 2025) (signed Jan. 20, 2025) §§ 1, 2(f). The NSA's endorsement of the EO's derogatory statements about transgender women is severe harassment, just as such statements would be if made to Ms. O'Neill by her direct supervisor. Accordingly, Defendant's motion must be denied.

## FACTUAL BACKGROUND

Plaintiff Sarah O'Neill is a transgender woman who has worked as a data scientist at the NSA since January 2019. Compl. ¶¶ 18, 21.[3] At the time she was hired by the NSA, Ms.

[3] A transgender person is someone who has a gender identity that differs from their sex assigned at birth—*i.e.*, a transgender woman is a person who has a female gender identity, but whose sex was designated male at birth. Compl. ¶ 24. Gender identity is a person's fundamental, internal sense of themselves as belonging to a particular gender. *Id.* ¶ 23. There is medical consensus that transgender people face increased risks to their physical and mental health when required to use restrooms according to their sex assigned at birth and that transgender people experience improved mental health when they have access to restrooms that align with their gender identity. *Id.* ¶ 26. Studies also consistently show that using correct pronouns for transgender individuals significantly benefits their mental health and that using incorrect pronouns negatively impacts their health. *Id.* ¶ 27.

O'Neill was already living as a woman and had begun her physical transition to align with her gender. *Id.* ¶ 21.

From at least January 2022 until approximately April 8, 2025, the NSA had an internal policy, NSA Policy 1-78, "Gender Identity, Expression, and Affirmation" ("Policy 1-78"), that permitted NSA employees to use pronouns and restrooms consistent with their gender identity. *Id.* ¶ 31. From approximately March 2, 2023, until approximately January 30, 2025, the NSA had an internal policy, NSA Policy 6-33, "User Identification on the NSA/CSS Classified Network," ("Policy 6-33"), that permitted NSA employees to use pronouns and primary names aligned with their gender identity on NSA information systems. *Id.* ¶ 34. Policies 1-78 and 6-33 provided Ms. O'Neill with assurance that the NSA recognized and respected her identity and her right to a workplace free of harassment and discrimination pursuant to Title VII. *Id.* ¶ 59.

On January 20, 2025, President Trump issued Executive Order 14168, which denies the very existence of transgender people. *See* Pl.'s RJN, Ex. A. Section 1 of the EO, "Purpose," declares:

> Across the country, ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers. This is wrong. Efforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being. The erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system. Basing Federal policy on truth is critical to scientific inquiry, public safety, morale, and trust in government itself.

*Id.* Ex. A § 1. The Executive Order rejects the idea that a person's gender identity can differ from their sex, characterizing it as "gender ideology," and defines that term in part as "permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." *Id.* Ex. A § 2(f).

Flouting medical consensus and science, the EO defines sex as based on "immutable" biological characteristics determined at conception. *Id.* Ex. A § 2(a). Under this definition, "woman" and "female" mean a "person belonging, at conception, to the sex that produces the large reproductive cell." *Id.* Ex. A § 2(d). The EO directs federal agencies to implement its definition of sex and designate intimate, sex-segregated spaces in federal workplaces, such as bathrooms, by "sex and not identity." *Id.* Ex. A § 4(d).

Thereafter, the DoD and the NSA undertook a series of actions to implement the Executive Order. Compl. ¶¶ 42–58.

On January 31, 2025, Secretary Hegseth issued a memorandum (the "Hegseth Memorandum") declaring that "President Trump has given us our marching order in his Executive Order 14168." *Id.* ¶ 44. The Hegseth Memorandum stated that "the Department of Defense will remove all traces of gender ideology" and directed DoD components to "[e]nsure that intimate spaces designed for women, girls, or female (or for men, boys, or males) are designated by sex and not identity." *Id.* The same day, Acting Under Secretary of Defense Darin S. Selnick issued a memorandum for DoD civilian employees (the "Selnick Memorandum") stating that the Department "will take prompt action to ensure that all programs and activities align with [the] principles" of the Executive Order. *Id.* ¶ 45. On March 4, 2025, Acting Assistant Secretary Tim Dill issued a Memorandum (the "DoD Memorandum") stating that transgender individuals are no longer permitted to serve in the military. *Id.* ¶ 46.

On approximately January 30, 2025, the NSA updated Policy 6-33 to prohibit Agency personnel from using any pronouns in their signature blocks. *Id.* ¶ 43. In March 2025, the NSA updated Policy 6-33 again, this time providing that Agency personnel were permitted to use pronouns in their email signature blocks, but only if they were in accordance with the Executive

Order and guidance from the DoD, such that "pronoun usage when referring to [employees] must reflect an [employee's] sex." *Id.* ¶¶ 47, 49–51, 62. In a March 19, 2025, newsletter announcing the change, the NSA's Inspector General, citing the Executive Order, stated that "gender ideology terminology . . . is not permitted" and pronoun usage in official correspondence must be consistent with the EO. *Id.* ¶ 50.

From approximately March 2025 to the present, the NSA repeatedly updated its Equal Employment Opportunity Policy to restrict the availability of information about anti-discrimination laws applicable to LGBTQ+ people and remove the words "transgender" and "nonbinary." *Id.* ¶ 48. Between March 20, 2025, and May 5, 2025, Ms. O'Neill observed that all but one Equal Employment Opportunity sign had been removed from NSA common areas, and the remaining sign no longer referenced transgender status or gender identity as a protected characteristic (as the signs had done before the Executive Order). *Id.* ¶ 52.

On April 8, 2025, the NSA canceled Policy 1-78 and advised employees that they were required to use intimate spaces, including restrooms, in accordance with their biological sex. *Id.* ¶ 53. The NSA announced this change in an Agency-wide newsletter. *Id.*

On May 6, 2025, Secretary of Defense Hegseth stated publicly on X: "No More Trans @ DoD." *Id.* ¶ 54.

On approximately May 9, 2025, the NSA issued a newsletter stating that the Agency had modified its purchase order guidance to comply with the Executive Order prohibiting federal funding for language that "inculcates gender ideology," thus preventing the Agency from purchasing materials containing the words "transgender" or "nonbinary." *Id.* ¶ 55.

On approximately May 14, 2025, Ms. O'Neill noticed that the Primary Name Change Tool (the "Tool"), which had permitted personnel to use a workplace display name different from

their legal name, was disabled and that instructions on how to utilize the Tool had been removed from the internal NSA website. *Id.* ¶ 56–57. The Tool, made available pursuant to NSA Policy 1-78 and NSA Policy 6-33, enabled transgender people who had not completed the often-onerous process of legal name and gender change to display the name their coworkers should use to refer to them, eliminating the need to constantly disclose to others that they are transgender. *Id.*

The DoD/NSA Implementation Actions have caused Ms. O'Neill to experience anxiety, fear, distress, humiliation, denigration, and degradation. *Id.* ¶¶ 8–9, 66. Because she has stopped using pronouns in her email signature block to comply with Policy 6-33, she worries that she will be misgendered by a colleague. *Id.* ¶ 62. To avoid having to use the men's restroom, which would be degrading, distressing, and humiliating, Ms. O'Neill takes steps to minimize the need to use the restroom at work, including reducing her water intake during the workday and skipping lunch. *Id.* ¶¶ 70–71. She often dreads going to work and finds it difficult to get out of bed in the morning. *Id.* ¶ 77. On more than a dozen occasions, Ms. O'Neill's psychological distress was so overwhelming that she was unable to go to work and had to call out sick, and because she ran out of sick time and other paid leave, she had to take leave without pay. *Id.*

## LEGAL STANDARD

When evaluating a motion to dismiss under Rule 12(b)(6), the court must "assume as true all its well-pleaded facts and draw all reasonable inferences in favor of the plaintiff." *Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 452 (4th Cir. 2017). At this stage, a Title VII plaintiff "need not plead a prima facie case." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 210 (4th Cir. 2022). Instead, "[s]o long as a complaint contains factual allegations that 'raise a right to relief

above the speculative level, thereby nudging [the] claims across the line from conceivable to plausible,' dismissal is improper." *Id.* (citation omitted).

On a 12(b)(6) motion, the court may only consider the complaint, matters for which judicial notice is proper or which constitute "adjudicative facts," and documents incorporated by reference. *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015). Defendant attached the Final Agency Decision ("FAD") in Ms. O'Neill's Equal Employment Opportunity case as an exhibit to its brief, but failed to file a request for judicial notice. Nor is the FAD incorporated by reference into the Complaint.[4] Accordingly, the Court should not consider the FAD. If the Court does consider the FAD, it may only do so for the limited purpose of establishing the existence of the administrative proceeding and its findings, not for the truth of any fact recounted in the FAD. *See Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 787 (D. Md. 2013); *Lacayo v. Donahoe*, No. 14-CV-04077-JSC, 2015 WL 993448, at *9–*10 (N.D. Cal. Mar. 4, 2015). Moreover, because federal employees asserting Title VII claims have the right to trial *de novo* in district court, the FAD's legal analysis is entitled to no deference. *Chandler v. Roudebush*, 425 U.S. 840 (1976).

However, the Court should grant Plaintiff's Request for Judicial Notice of the EO. *See* Pl.'s RJN. The existence, text, and effective date of a published executive order are "not subject to reasonable dispute" because they are "accurately and readily determined from sources whose accuracy cannot reasonably be questioned," namely the Federal Register. Fed. R. Evid. 201(b)(2). Plaintiff seeks judicial notice only of what the EO says, not of the truth of its assertions, which Plaintiff disputes.

---

[4] The Complaint's sole reference to the FAD is for the purpose of establishing administrative exhaustion. Compl. ¶14.

## ARGUMENT

### A. Ms. O'Neill States A Plausible Title VII Claim.

Under Title VII, it is unlawful for an employer, including the federal government, to subject an employee to a hostile work environment based on sex. *See* 42 U.S.C. § 2000e-16(a); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). In 2020, the Supreme Court recognized that discrimination based on transgender status or sexual orientation is discrimination based on sex, thereby confirming Title VII's protection of transgender employees. *Bostock*, 590 U.S. at 660. Since the Supreme Court's decision in *Bostock*, lower courts have consistently held that Title VII prohibits harassment based on transgender status or sexual orientation. *E.g., Doe*, 3 F.4th at 300 n.1; *Sharpe-Miller*, 181 F.4th at 1055; *Copeland v. Georgia Dep't of Corr.*, 97 F.4th 766, 775 (11th Cir. 2024); *Eller v. Prince George's Cnty. Pub. Schs.*, 580 F. Supp. 3d 154, 172 (D. Md. 2022).

A hostile work environment is created when the workplace is "permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citing *Meritor*, 477 U.S. at 65–67). A plaintiff asserting a hostile work environment claim under Title VII must establish that the offending actions were (1) unwelcome, (2) based on her sex, (3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) imputable to her employer. *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003).

Because Defendant does not dispute that the DoD/NSA Implementation Actions were unwelcome or that they are imputable to the Agency,[5] the only questions before the Court are (1) whether the Complaint plausibly alleges the DoD/NSA Implementation Actions were based on sex, and (2) whether the Complaint plausibly alleges they were sufficiently severe or pervasive to create a hostile work environment. Ms. O'Neill has plausibly alleged both.

**1. The DoD/NSA Implementation Actions Are Based on Sex.**

Defendant argues that the DoD/NSA Implementation Actions are not based on sex because they are applicable to all employees, and the application of these policies to Ms. O'Neill would not change if her sex were different. Defendant's argument must be rejected because Defendant fails to apply the *Bostock* test and ignores Ms. O'Neill's allegations regarding the intent of the DoD/NSA Implementation Actions, which this Court must accept as true in evaluating Defendant's 12(b)(6) motion. *See Nanni*, 878 F.3d at 452. The DoD/NSA Implementation Actions restricting pronoun use and restroom access penalize Ms. O'Neill for actions tolerated when taken by cisgender women. If Ms. O'Neill's sex were different, such that she were a cisgender woman, they would have no adverse effect on her. Therefore, under *Bostock*'s analysis, they are based on sex. *See Bostock*, 590 U.S. at 660.

Further, the DoD/NSA Implementation Actions are in service of a broad effort to marginalize transgender employees in the federal workplace and in the DoD in particular. All of the DoD/NSA Implementation Actions are grounded in the reasoning of the EO, which asserts

[5] Defendant seems to suggest that the DoD/NSA Implementation Actions are shielded from Title VII review because Defendant was simply "implement[ing] policy changes to comply with Presidential Executive Orders." ECF No. 37-1, Defendant's Memorandum in Support of Motion to Dismiss ("Def.'s Mem.") at 6. However, Title VII is a statute enacted by Congress, and the President's authority to direct executive agencies through Executive Orders does not extend to directing them to violate federal statutes. *See Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (finding that even if the Secretary were acting at the "behest of the President," it "'does not leave the courts without power to review the legality [of the action], for courts have power to compel subordinate executive officials to disobey illegal Presidential commands'") (quoting *Soucie v. David*, 448 F.2d 1067, 1072 n.12 (D.C. Cir. 1971)).

that transgender women are men making a "false claim" and that all recognition of transgender people is harmful to American society. *See* Pl.'s RJN, Ex. A § 2(f). The EO's principles are explicitly grounded in its notion of sex as biological and immutable, and its conceptualization of transgender people as a threat to women and to "the validity of the entire American system" is therefore based on sex. *Id.* Ex. A § 1. All statements and actions by agency leadership adopting the EO's principles are thus also conduct based on sex. *See Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80 (1998) ("A trier of fact might reasonably find [an actionable hostile work environment] . . . if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace.").

**a. The NSA's Policies Restricting Restroom and Pronoun Use Penalize Ms. O'Neill for Conduct Tolerated in Cisgender Women.**

Policy 6-33 defines prohibited "gender ideology terminology" by reference to the EO, which in turn defines "gender ideology" as "permitting the false claim that males can identify as and thus become women and vice versa." Compl. ¶ 49–50; Pl.'s RJN, Ex. A § 2(f). As such, Policy 6-33 prohibits Ms. O'Neill from using feminine pronouns in any official communications, on the ground that her identity is a "false claim." In contrast, cisgender women are not told their identity is a "false claim," nor do they risk discipline or job loss by referring to themselves with female pronouns. Because changing Ms. O'Neill's sex would make her cisgender and transform the impact of this policy on her, Policy 6-33 "penalizes" Ms. O'Neill "for traits or actions that it tolerates in [a cisgender] employee identified as female at birth." *See Bostock*, 590 U.S. at 660.

Similarly, when it cancelled Policy 1-78, "Gender Identity Expression and Affirmation," the NSA announced that all employees are now required to use restrooms consistent with their

biological sex, as defined in the EO, and not their gender identity. Compl. ¶ 53. Therefore, Ms. O'Neill must now use men's restrooms or single-occupancy stalls or risk discipline or job loss, and as a result has curtailed her water and food consumption, been unable to attend certain meetings in person, and has experienced significant mental anguish. *Id.* ¶ 65–72. Again, cisgender women face no discipline for using restrooms consistent with their gender identity. This restriction thus penalizes Ms. O'Neill based on her transgender status and therefore, based on sex. *See Bostock*, 590 U.S. at 660.

**b. The DoD/NSA Implementation Actions Are Motivated By Hostility Toward Transgender People.**

Further, Ms. O'Neill's allegations demonstrate that the DoD/NSA Implementation Actions are based on sex under the principles articulated in *Oncale*. *Oncale* held that harassment "need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." 523 U.S. at 80. A plaintiff may instead establish that harassment is based on sex with evidence of comparative treatment toward individuals of the opposite sex or with evidence of "general hostility" toward individuals of the plaintiff's sex. *Id.* Under *Bostock*, conduct generally hostile toward transgender people is based on sex. *E.g.*, *Doe,* 3 F.4th at 300 n.1. Here, Ms. O'Neill plausibly alleges that EO 14168 and the DoD/NSA Implementation Actions are motivated by anti-transgender animus and intended to make the NSA a generally hostile work environment for transgender people. Compl. ¶ 74.

These allegations are not merely conclusory. At the motion to dismiss stage, the Court must accept as true Ms. O'Neill's factual allegations that transgender people exist, that misgendering is harmful, and that prohibiting transgender people from utilizing restrooms that align with their gender identity is harmful. Compl. ¶¶ 1, 24–27. Ms. O'Neill alleges that NSA

leadership was well aware of these facts, yet they decided to cancel the NSA's internal policy protecting transgender employees from such harm and to instead adopt a policy denying their existence or rights – knowing that doing so would psychologically harm transgender employees and make it more difficult for them to work at the agency. Compl. ¶¶ 63, 66, 72, 74; *see Oncale,* 523 U.S. at 80.

As the Court must draw all reasonable inferences in favor of Ms. O'Neill, it should also construe the DoD/NSA Implementation Actions to be in service of Secretary Hegseth's announced objective of purging the DoD of transgender people. Compl. ¶ 54. As Secretary of Defense, Secretary Hegseth has ultimate authority over the NSA. *See Founding Church of Scientology of Washington, D.C., Inc. v. Nat'l Sec. Agency*, 610 F.2d 824, 825 n.5 (D.C. Cir. 1979) ("NSA is a separately organized agency within the Department of Defense, and is controlled by the Secretary of Defense."). It is reasonable to infer, given Secretary Hegseth's public announcement, "No More Trans @ DoD," the Hegseth and Selnick Memoranda's embrace of Executive Order 14168, and the DoD Memorandum stating transgender individuals may no longer enlist in the military, that Secretary Hegseth harbors animus toward transgender people and believes they do not belong in the Department of Defense. Compl. ¶¶ 54, 44–46.

With respect to civilian NSA employees, over whom Secretary Hegseth has ultimate authority, the Selnick Memorandum makes clear that the DoD/NSA Implementation Actions are intended to implement the "principles" of the EO. Compl. ¶¶ 45–46. Those "principles" include that Ms. O'Neill and transgender women like her make a "false claim" when they assert their gender, that they do so in order to "fundamentally attack women" and "depriv[e] them of their dignity, safety, and well-being," and that acknowledging Ms. O'Neill's right to exist has a "corrosive impact" on women and on "the validity of the entire American system." *See* Pl.'s

RJN, Ex. A §§ 1, 2(f). In other words, the principle of the EO is that Ms. O'Neill, a longtime civil servant in the Department of Defense, should be seen as a threat to America because she was assigned male at birth. As such, not only has the NSA's leadership expressed sex-based animus toward Ms. O'Neill by undertaking the DoD/NSA Implementation Actions, it has made sex-based animus the policy of the agency through Implementation Actions that heap opprobrium on transgender employees. *See Washington v. Trump,* 768 F. Supp. 3d 1239, 1277 (W.D. Wash. 2025) (finding the EO's language, "which declares that it is 'false' that 'males can identify as . . . women and vice versa' . . . denies and denigrates the very existence of transgender people" and reflects "a bare desire to harm" transgender people amounting to "baldfaced stigmatization").

### 2. The Supreme Court's Decision in *United States v. Skrmetti* Does Not Change the Analysis.

*Skrmetti* has no bearing on Ms. O'Neill's claim. *Skrmetti* was an equal protection challenge to a Tennessee law that prohibits health care providers from prescribing puberty blockers or hormones to minors for the treatment of gender dysphoria. 605 U.S. 495. *Skrmetti* is not a Title VII decision, and its reasoning does not apply because Ms. O'Neill does not challenge a policy regarding medical diagnosis or treatment as facially discriminatory. *See* 605 U.S. at 507. In *Skrmetti*, the Court concluded that the law at issue classified based on age and medical use, not sex, because transgender minors of any sex could obtain hormonal treatment for qualifying conditions, and no minors of any sex could obtain treatment for gender dysphoria. *Id.* at 515–517. Unlike the Tennessee law analyzed in *Skrmetti,* the DoD/NSA Implementation Actions prohibit only transgender employees from using pronouns and restrooms aligned with their gender. Cisgender employees may do so without consequence. While in *Skrmetti*, it was at

least theoretically possible that a transgender minor could obtain hormonal treatment for a different qualifying condition such as a physical injury, in this case there is no theoretical group of transgender employees who the DoD/NSA Implementation Actions permit to use pronouns and restrooms consistent with their gender. *See id.* at 521–22. Accordingly, the DoD/NSA Implementation Actions are based on sex.

Defendant's reliance on *Lange v. Houston County*, 152 F.4th 1245 (11th Cir. 2025), an out-of-circuit opinion, is misplaced. *Lange* applied the reasoning of *Skrmetti* in a facial challenge to an insurance plan exclusion of sex reassignment surgeries. *Id.* Nothing in *Lange* supports Defendant's argument that the DoD/NSA Implementation Actions are not based on sex because they prohibit everyone from using "gender ideology terminology," and "both sexes are expected to use the bathroom aligning with sex." Def.'s Mem. at 5. *Bostock* rejected this reasoning, explaining that an employer who penalizes both male employees for feminine behavior and female employees for masculine behavior cannot escape liability by claiming it treats both sexes alike. *See* 590 U.S. at 662.[6]

### 3. The DoD/NSA Implementation Actions Are Sufficiently Severe or Pervasive to Create a Hostile Work Environment.

The third element of a hostile work environment claim requires a plaintiff to establish that the offending actions were sufficiently severe *or* pervasive to alter the conditions of her employment and create an abusive work environment. *Ocheltree*, 335 F.3d at 331. There is no "talismanic number of incidents" required to reach the threshold of pervasiveness, and a

[6] Similarly, in *Skrmetti*, the Court explained that a law that inherently classifies based on a protected characteristic, such as race, cannot be saved by merely reframing the law in abstract terms, explaining that the antimiscegenation law the Court struck down in *Loving v. Virginia*, 388 U.S. 1 (1967), would "not have shed its race-based classification had it, for example, prohibited '*any* person from marrying an individual of a different race.'" 605 U.S. at 514.

sufficiently severe episode that occurs only once may also meet the standard for an actionable hostile work environment. *See Sharpe-Miller*, 181 F.4th at 1055, 1064 (citation omitted).

Although Ms. O'Neill is only required to show that the DoD/NSA Implementation Actions are either severe *or* pervasive, she has plausibly alleged both.[7] The challenged DoD/NSA Implementation Actions are not isolated comments or stray workplace disputes; they are official, Agency-wide policies and communications that govern Ms. O'Neill's daily working conditions, communicate that her gender is not recognized at work, and force her to navigate every workday under rules that single her out for unequal and degrading treatment.[8]

**a. Under a Totality of the Circumstances Analysis, Non-Targeted Conduct Can Create a Hostile Work Environment.**

The determination of whether harassment is sufficiently severe or pervasive to create a hostile work environment requires a court to evaluate the totality of the circumstances. *See Harris,* 510 U.S. at 23 ("[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at *all* the circumstances.") (emphasis added). Because the "contours of one's environment . . . may surely exceed the individual dynamic" between the plaintiff and her supervisor or coworkers, *see Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001), courts have consistently recognized that harassing conduct "need not be directly targeted at a particular plaintiff in order to pollute a workplace and give rise to a Title VII claim," *see Sharp v. S&S Activewear, L.L.C.*, 69 F.4th 974, 977 (9th Cir. 2023). This includes both conduct that is

[7] Defendant's framing of the standard as "severe and pervasive" misstates the law. Def.'s Mem. at 7. Defendant argues that its conduct is not severe or pervasive because Ms. O'Neill has not been subjected to any "supervisory actions," because she has not yet been misgendered, and because the pronoun and bathroom policies have not yet been enforced against her. Def.'s Mem. at 6–7. But that is not the relevant inquiry. *See Meritor*, 477 U.S. at 64 ("[T]he language of Title VII is not limited to 'economic' or 'tangible' discrimination."). As discussed in Section A.3.a., *infra*, the existence of a hostile work environment is a totality of the circumstances inquiry that does not depend on the existence of any one discriminatory employment action. Moreover, there can be no reasonable dispute that the leaders of the DoD and NSA are "supervisors" within the meaning of Title VII. *See Vance v. Ball State Univ.,* 570 U.S. 421, 424 (2013).

targeted at the workplace writ large, including workplace-wide policies, and conduct that is targeted at other employees with the same protected identities. The underlying principle is that hostility directed toward an entire group of which a plaintiff is a member—such as Christians, or women—creates a hostile work environment for that plaintiff. *See Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 384, 388 (2d Cir. 2020) (statements that Greeks are racially superior, that "Egyptian[s] do the dirty work in Greece," and "[r]eligions [are] for the stupid people" contributed to hostile work environment for Egyptian Christian plaintiff).

In *Sharp*, the Ninth Circuit held that sexually derogatory music played constantly and publicly throughout the workplace could foster a hostile work environment based on sex. 69 F.4th at 977. Even though the music was "not . . . targeted toward any particular woman, female employees allegedly experienced the content in a unique and especially offensive way." *Id.* at 981. The fact that the music was played throughout the workplace was not evidence of the conduct's sex-neutrality, as the defendant argued, but rather, as the court concluded, it constituted evidence of the music's "invidious pervasiveness." *Id.*

Likewise, in *Ocheltree*, the Fourth Circuit held that male employees' "sex-laden and sexist talk and conduct" could constitute sexual harassment of a company's sole female employee, even though the conduct was not directed exclusively at her and "could have been heard or seen by anyone present in the shop." 335 F.3d at 332. The court held that a rational jury could find that this daily conduct was sufficient to create an abusive work environment because the plaintiff was "subjected every day to some variety of this offensive conduct, which was humiliating to her personally and to women in general" and "surely made it more difficult for her to do her job." *Id.* at 333.

**b. The DoD/NSA Implementation Actions Are Sufficiently Pervasive to Create a Hostile Work Environment.**

Like other kinds of non-targeted conduct, a discriminatory workplace-wide policy can create a hostile work environment because "a policy which affects working conditions on a daily basis . . . shows pervasiveness." *See Lopez v. Mountain View Care & Rehab. Ctr., LLC*, No. 3:19-cv-00785, 2022 WL 202955, at *10 (M.D. Pa. Jan. 21, 2022) (denying defendant's motion for summary judgment because a rational juror might find that the impact of an English-only policy on Hispanic workers was sufficiently severe or pervasive).

Title VII decisions analyzing the impact and legality of English-only policies are instructive. In *Maldonado v. City of Altus*, 433 F.3d 1294 (10th Cir. 2006), the Tenth Circuit held that a rational juror could find that an English-only policy created a hostile work environment for Hispanic employees. The court emphasized that the mere *existence* of a policy can create or contribute to a hostile work environment:

> There are, however, other considerations with respect to a *policy* that allegedly creates a hostile work environment. The policy itself, and not just the effect of the policy in evoking hostility by co-workers, may create or contribute to the hostility of the work environment. A policy requiring each employee to wear a badge noting his or her religion, for example, might well engender extreme discomfort in a reasonable employee who belongs to a minority religion, even if no co-worker utters a word on the matter. Here, the very fact that the City would forbid Hispanics from using their preferred language could reasonably be construed as an expression of hostility to Hispanics. At least that could be a reasonable inference if there was no apparent legitimate purpose for the restrictions.

*Id.* at 1304–05 (emphasis in original); *see also Lopez*, 2022 WL 202955 at *10 ("[A] rational juror could . . . find on this record that the impact of the English-only policy on Hispanic workers was 'sufficiently severe or pervasive to alter the conditions of [their] employment and create an abusive working environment.'").

Like the English-only policies at issue in *Maldonado* and *Lopez*, the DoD/NSA Implementation Actions, specifically the pronoun, bathroom, and Equal Employment Opportunity policies, pervade Ms. O'Neill's workplace by "affect[ing] working conditions on a daily basis." *See Lopez,* 2022 WL 202955, at *10. These are not isolated incidents that Ms. O'Neill can avoid or ignore; these are official workplace rules that limit how she may identify herself, where she may use the restroom, and whether she is protected from discrimination and harassment. Though ostensibly directed at the entire workplace, these policies affect transgender employees in a "unique and especially offensive way." *See Sharp*, 69 F.4th at 981.

Defendant's reliance on *Hamel v. Board of Education of Harford County*, No. cv JKB-16-2876, 2018 WL 1453335 (D. Md. Mar. 23, 2018), for the proposition that enforcement of broadly applicable policies is not harassment is misplaced. In *Hamel*, the plaintiff alleged that new policies "requiring teachers to pick up their own mail, supervise elementary school children in the hallways, and comply with state standardized testing chain-of-custody regulations" were in fact intended to harass her because of her disability. 2018 WL 1453335, at *6. In a decision affirming summary judgment, the district court found that the plaintiff had produced no evidence to suggest that school administrators' neutral explanations for these measures were pretextual. *Id.* at *6–*7. Here, in contrast, the policies at issue are because of sex, for the reasons explained in Section A.1 *supra*, and at this stage the Court must accept as true plaintiff's allegations that they are intended to marginalize transgender employees.

**c. The DoD/NSA Implementation Actions Are Sufficiently Severe to Create a Hostile Work Environment.**

Not only are DoD/NSA Implementation Actions sufficiently pervasive to create a hostile work environment, but they are also sufficiently severe to do so. The Fourth Circuit has

observed that, "[i]n measuring the severity of harassing conduct, the status of the harasser may be a significant factor" because "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character." *See Boyer-Liberto*, 786 F.3d at 278 (citation omitted).

Here, The DoD/NSA Implementation Actions are more than just "rude treatment by coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict," as Defendant claims. Def.'s Mem. at 6. Rather, they are policies and statements from the highest levels of the NSA and DoD that convey the message that transgender people are unworthy of equal respect and treatment, that their very identity is a fraud, and that all mentions of their existence should be erased. The fact that the "harasser" is, in this case, the Agency, the DoD, and their leaders, "invests [the] harassing conduct with a particular threatening character." *See Boyer-Liberto*, 786 F.3d at 278.

**d. Ms. O'Neill Reasonably Perceived the Agency to be a Hostile Work Environment.**

The severe/pervasive element has "both subjective and objective components," *see Ocheltree*, 335 F.3d at 333, requiring the plaintiff to show both that she perceived the environment to be hostile, and that a "reasonable person" in her position would do the same, *see Oncale*, 523 U.S. at 81.

The DoD/NSA Implementation Actions have caused Ms. O'Neill to experience daily anxiety, fear, distress, humiliation, denigration, and degradation. Compl. ¶¶ 8–9, 66. Defendant's claim that the "practical impact on Plaintiff's work life . . . was that Plaintiff dreaded reading a newsletter, worried about being misgendered, and opted to use single-occupancy bathrooms instead of men's rooms, which is sometimes inconvenient," *see* Def.'s Mem. at 7,

minimizes the very real psychological harm she has suffered and continues to suffer as a result of the DoD/NSA Implementation Actions.

Ms. O'Neill's distress is eminently reasonable—studies consistently show that using correct pronouns for transgender individuals significantly benefits their mental health and that using incorrect pronouns negatively impacts their health. Compl. ¶ 27. Since Ms. O'Neill has stopped using pronouns in her email signature block to comply with NSA Policy 6-33, she worries that there is now a higher chance of being misgendered at work. *Id*. ¶ 62. While it is true that Ms. O'Neill has not yet been misgendered, the fear that she might be is, in and of itself, significant and distressing. *Id*. Indeed, that is the very purpose of including pronouns in a signature block—to alleviate daily anxiety by preventing misgendering from happening in the first place. Ms. O'Neill's fear that she will be misgendered is especially reasonable given new NSA guidance that "pronoun usage when referring to [employees] must reflect an [employee's] sex." *Id.*

There is also medical consensus that transgender people face increased risks to their physical and mental health when required to use restrooms according to their sex assigned at birth. *Id.* ¶ 26; *see Grimm v. Gloucester Cnty. Sch. Bd.,* 972 F.3d 586, 617–18 (4th Cir. 2020), as amended (Aug. 28, 2020) (finding transgender minor subjected to policy excluding him from the boy's bathroom suffered legally cognizable emotional and dignitary harm because the policy was stigmatizing and conveyed a hostile message). Pursuant to the DoD/NSA Implementation Actions, Ms. O'Neill is required to use the men's restrooms, which would be degrading, distressing, and humiliating for Ms. O'Neill because it is inconsistent with her gender identity. Compl. ¶¶ 65–66. Upon information and belief, the NSA is actively enforcing this policy, and Ms. O'Neill is afraid she will face discipline if she uses the women's restroom. *Id.* ¶ 66. When

possible, Ms. O'Neill tries to get around this discriminatory policy by using single-occupancy restrooms, but this is not an easy task—there are a limited number of such restrooms in the building where Ms. O'Neill works, and they are often occupied. *Id.* ¶ 67. When she does have to use the restroom, Ms. O'Neill is anxious about finding an available single-occupancy restroom in time, which can sometimes take up to fifteen minutes. *Id.* ¶¶ 69–70. Because she often cannot spare this time during the workday, Ms. O'Neill takes steps to minimize the need to use the restroom at work—reducing her water intake during the workday and skipping lunch. *Id.* ¶¶ 70–71. This is more than a mere "inconvenien[ce]," *see* Def.'s Mem. at 7—planning for how she will use the restroom has become a source of constant concern and anxiety for Ms. O'Neill, *see* Compl. ¶ 71.

Defendant argues that "where an employee can still 'perform her job duties as a result of her working environment,' conduct may not be severe or pervasive." Def.'s Mem. at 6 (citation omitted). But "a victim's ability to succeed at her job in the face of harassment [does not] mean that she has forfeited her right to bring a claim for hostile work environment." *See Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1231 (10th Cir. 2022). Though Ms. O'Neill is largely able to perform her job duties, it is not without significant effort. Compl. ¶ 76. She often dreads going to work and finds it difficult to get out of bed in the morning. *Id.* ¶ 77. On more than a dozen occasions, Ms. O'Neill's psychological distress was so overwhelming that she was unable to go to work and had to call out sick, causing her to run out of paid time off and requiring her to take leave without pay. *Id*. The DoD/NSA Implementation Actions also interfere with Ms. O'Neill's ability to perform her job duties by limiting where she can go to meetings to buildings where she knows she will be able to access a single-occupancy restroom. *Id.* ¶¶ 67–68.

Ms. O'Neill has plausibly alleged that the DoD/NSA Implementation Actions were based on sex, and that they were sufficiently severe or pervasive to create a hostile work environment.

**B. In the Alternative, Ms. O'Neill Should Be Granted Leave to Amend**

To the extent that the Court identifies pleading deficiencies, Plaintiff respectfully requests that should the Court grant Defendant's motion, Plaintiff be granted leave to file a First Amended Complaint to cure any pleading deficiencies.[9] *See* Fed. R. Civ. P. 15(a)(2). Ms. O'Neill remains employed at the NSA and, since filing her complaint, continues to be subjected to conduct that would provide additional support for her hostile work environment claim. Moreover, Ms. O'Neill can amend her Complaint to make additional allegations that support the conclusion that the DoD/NSA Implementation Actions are motivated by animus toward transgender people, including but not limited to Secretary Hegseth's statements, "No more dudes in dresses, we're done with that shit,"[10] and "At the Department of War, we do training, not trannies."[11]

[9] In the alternative, Plaintiff requests that, should the Court grant Defendant's motion, it be without prejudice such that Plaintiff may re-file.

[10] *S*ee Secretary Hegseth, Keynote Address at Special Operations Forces Week 2025 (May 6, 2025), https://www.war.gov/News/Transcripts/Transcript/article/4176603/secretary-of-defense-pete-hegseth-delivers-keynote-address-at-special-operation.

[11] *See* Robin Opsahl, *US Defense Secretary Pete Hegseth joins Rep. Zach Nunn at Iowa State Fair*, Iowa Capital Dispatch (Aug. 17, 2026), https://iowacapitaldispatch.com/2026/08/17/u-s-defense-secretary-pete-hegseth-joins-u-s-rep-zach-nunn-at-iowa-state-fair/.

## CONCLUSION

For the reasons set forth above, Ms. O'Neill respectfully requests that the Court deny Defendant's Motion to Dismiss. In the alternative, Ms. O'Neill requests leave to amend her complaint.

Dated: September 4, 2026

Respectfully submitted,

Rebecca Peterson-Fisher*
Isabel Rothberg*
**Katz Banks Kumin LLP**
235 Montgomery Street, Suite 665
San Francisco, CA 94104
Tel: (415) 813-3260
Fax: (415) 813-2495
Email: peterson-fisher@katzbanks.com
rothberg@katzbanks.com

/s/ Matthew B. LaGarde
Matthew B. LaGarde (D. Md. Bar No. 21835)
Carolyn L. Wheeler*
Rachel Green*
11 Dupont Circle, Suite 600
Washington, D.C. 20036
Tel: (202) 299-1140
Fax: (202) 299-1148
Email: lagarde@katzbanks.com
wheeler@katzbanks.com
green@katzbanks.com

*Admitted *pro hac vice*

*Counsel for Plaintiff Sarah O'Neill*