**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| O'NEILL, | * | |
| | * | |
| PLAINTIFF, | * | |
| | * | |
| v. | * | No. 1:25-cv-04228-LKG |
| | * | |
| RUDD, | * | |
| | * | |
| DEFENDANT. | * | |

******

**REPLY IN SUPPORT OF MOTION TO DISMISS**

## I. INTRODUCTION

Plaintiff's opposition fails to defeat the Agency's motion to dismiss. Plaintiff's alleged experience at her federal workplace following the issuance of Executive Order 14168, entitled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," and other alleged ensuing actions by the Agency, does not rise to the level of an actionable violation of Title VII. While the Agency actions that Plaintiff challenges do impact transgender individuals, those actions are not necessarily – and were not in this case – actions, based on Plaintiff's biological sex. Moreover, Plaintiff does not allege facts establishing that she experienced conduct sufficiently severe and/or pervasive to constitute a hostile work environment under the applicable legal standard.

## II. ARGUMENT

### A. Policies that impact transgender individuals are not sex-based discrimination by default.

Plaintiff's opposition is based on the supposition that transgender status is equivalent to sex, and that any action that is alleged to have a disparate impact on transgender individuals is necessarily a form of sex-based discrimination. *See* ECF 38 at 15 ("lower courts have consistently

held that Title VII prohibits harassment based on transgender status"). The Supreme Court has not gone this far and indeed has cautioned courts not to make the illogical leap Plaintiff encourages. *Untied States v. Skrmetti*. 605 U.S 495, 520–21 (2025). In *Bostock v Clayton County*, which addressed the termination of an employee for being homosexual or transgender, the Supreme Court observed that

> [J]ust as an employer who fires both Hannah and Bob for failing to fulfill traditional sex stereotypes doubles rather than eliminates Title VII liability, an employer who fires both Hannah and Bob for being gay or transgender does the same.

590 U.S. 644, 662 (2020). The "stereotypes" the Court was referencing did not include gender identity. *See id.* at 659, 662; *see also id.* at 681 ("Under Title VII too, we do not purport to address bathrooms, locker rooms, or anything else of the kind.").

The test that the Supreme Court has employed to determine whether impermissible sex discrimination has occurred is to observe where a policy does not apply differently if biological sex is inverted, it does not discriminate against transgender individuals. *Id.* Plaintiff's argument that *Skrmetti* does not apply to her claim because it is not a Title VII case misses the mark. ECF 38 at 20. *Skrmetti* explicitly interpreted and limited the very *Bostock* proposition Plaintiff stretches past its breaking point in service of her arguments here. *United States v. Skrmetti*, 605 U.S. 495, 520 (2025) (noting that *Bostock* requires, in Title VII cases, to "change one thing at a time and see if the outcome changes," and holding that "[u]nder the reasoning of *Bostock*, neither his sex nor his transgender status is the but-for cause of his inability to obtain testosterone").

None of the policies at issue here apply differently if biological sex or transgender status is inverted, and Plaintiff does not appear to argue that they do. *See* ECF 37 (Motion) (identifying policies at issue and explaining that each apply to everyone). To circumvent this Supreme Court precedent, Plaintiff argues that discrimination based on transgender status in itself is sex-based

discrimination, and the policies apply differently if *transgender status* is inverted. ECF 38 at 15. Plaintiff uses sleight of hand to change the legal standard, arguing that "If Ms. O'Neill's sex were different, ***such that she were a cisgender woman***, [the policies] would have no adverse effect on her." ECF 38 at 16.

This misstates and misapplies both *Bostock* and *Skrmetti*. Regardless of Plaintiff's biological sex or transgender status, the policies at issue would have exactly the same impact. For example, change Plaintiff's biological sex to male, and Plaintiff would still not be allowed to use bathrooms not aligned with that biological sex. Change Plaintiff's transgender status to cisgender, and Plaintiff would still not be allowed to use bathrooms not aligned with biological sex. Under the policy concerning the use of pronouns in official communication, a biological woman, whether cisgender or transgender, who refers to themselves with pronouns that match their biological sex would be acting in compliance with the policy. A biological male, whether cisgender or transgender, who refers to themselves with pronouns that match their biological sex would also be acting in compliance with the policy. Both cisgender and transgender persons who refer to themselves with pronouns that did not match their biological sex would be in violation of the policy. Thus, the policy does not differentiate based upon biological sex or transgender status. Neither sex nor transgender status is the but-for cause.

Even if the stated justification for the policy is, as Plaintiff alleges, that a transgender woman's use of female pronouns amounts to a "false claim," Opp. at 12, the justification for the policy does not change its application and is thus legally irrelevant.

Similarly, regardless of the rationale behind the bathroom policy, all employees regardless of transgender status are required to use restrooms that align with their biological sex. *See* ECF 38 at 17–18. A transgender woman such as Ms. O'Neill, a cisgender woman, or a transgender or

cisgender man or woman would each violate this policy if they use a restroom that does not align with biological sex [1] And under *Oncale*, men and women are treated equally under the applicable policies. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). The policies at issue apply to all individuals regardless of sex or transgender status, and there are no allegations of disparate discipline for any individual, regardless of sex or transgender status, who violates the policies.

Plaintiff also argues that the Court "must accept as true" allegations regarding "the intent of the DoD/NSA Implementation actions." ECF 38 at 16. This is not an accurate statement of the legal standard. The Court need not accept speculatory statements or legal conclusions as true at the motion to dismiss stage, and allegations about the intent of an entire government agency fall into that category. *See, e.g.*, *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 345 (4th Cir. 2006), *overruled on other grounds by Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264 (4th Cir. 2015) (courts need not accept conclusory factual assertions).

Thus, there is no other employer action "based on sex" here that is subject to Title VII liability. Plaintiff fails to state a claim because she has not plead facts sufficient to show discrimination based on sex.

**B. Plaintiff's fear of future enforcement is not sufficient to establish that she has been or is being subjected to severe or pervasive harassment.**

Even if Plaintiff has stated a claim for discrimination based on sex, she fails to plead facts showing she has experienced severe or pervasive harassment sufficient to constitute a hostile work environment. Thus dismissal of her claim is still required.

---

[1] *But cf.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616–17 (4th Cir. 2020) (in Title IX context, defining transgender bathroom policy not as requiring use of bathroom corresponding to sex but as "exclud[ing] [plaintiff] from the boys bathrooms," which made sex a but-for cause of the exclusion).

The policies in question here have never been applied to Ms. O'Neill, and her only alleged injuries are from being aware that the policies exist and feeling dissonance between her transgender identity and the behavior changes she has made at work since the policy changes went into effect. This is a far cry from the behavior experienced by the plaintiffs in the cases Ms. O'Neill cites in her opposition. *See, e.g.*, *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184, 187 (4th Cir. 2001) (plaintiff was subject to racial insults on a "'continuous daily' basis" including "incessant racial slurs, insults, and epithets"); *Sharp v. S&S Activewear, LLC*, 69 F.4th 974, 976–77 (9th Cir. 2023) (plaintiff experienced "sexually derogatory and violent content, played constantly and publicly throughout the workplace").

Enforcement of broadly applicable "commonsense" policies, even if that enforcement causes "substantial emotional distress," is not in itself harassment. *Hamel v. Bd. of Educ. of Harford Cnty.*, No. CV JKB-16-2876, 2018 WL 1453335, at *6 (D. Md. Mar. 23, 2018). In arguing that these policies impact her in a "unique and especially offensive way," Ms. O'Neill relies only on her transgender status as the basis for the disparate impact. ECF 38 at 25 (internal quotation omitted). Likewise, Ms. O'Neill attempts to distinguish the broadly applicable policies addressed in *Hamel* solely based on the assertion that the policies she challenges are "because of sex." Opposition at 20. As discussed in the previous section, discrimination based upon transgender status alone is not inherently synonymous with discrimination "because of sex."

In her opposition, Ms. O'Neill cites to a "fear that she *might* be" misgendered as support for her hostile work environment . ECF 38 at 22 (emphasis added). However, O'Neill admits to the fact that she has not, even as of a month ago, actually been misgendered at work. *Id.* Regardless of whether Ms. O'Neill can use pronouns in official communication that align with her gender identity, her legal name is Sarah, which is not (at least typically) a male name. ECF 1 at ¶

22. Her identity documents state her sex is female. *Id.* When she was hired at NSA in January 2019, she was living as a woman and had begun her physical gender transition. *Id.* at ¶ 21. Plaintiff does not allege that she has been misgendered by anyone she works with in the over one-year period since the policies at issue were enacted. While Plaintiff claims that she faces "increased risks to [her] physical and mental health when required to use restrooms according to [her] sex assigned at birth," by her own admission, she has the option to use nongendered single-occupancy restrooms. ECF 38 at 27–28.

**C. Ms. O'Neill should not be given leave to amend.**

Plaintiff asks for permission to amend her complaint with more evidence of "animus toward transgender people" from Defense Secretary Pete Hegseth. ECF 38 at 29. Amendment would be futile under these circumstances, since her case still depends on transgender status alone as being grounds for sex discrimination.

## III. CONCLUSION

For these reasons, and those stated in the original motion, Plaintiff fails to state a claim for hostile workplace harassment. Accordingly, her complaint should be dismissed.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

By: /s/

Molissa H. Farber (802255)
Assistant United States Attorney
36 S. Charles St., 4th Floor
Baltimore, Maryland 21201
410-209-4862
Molissa.Farber@usdoj.gov
*Counsel for Defendant*